UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 5 - 2014 ★

BROOKLYN OFFICE

-----------------------------------------------------------------x

SUNIL SAMTANI,

                Plaintiff,

    - against -

RAMAKRISHNA CHERUKURI, Individually and in
his official capacity as Chief Executive Officer of New
York Fragrance, Inc., and NEW YORK FRAGRANCE,
INC.,

                Defendants.

-----------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
11-CV-02159 (CBA) (RER)

**AMON, Chief United States District Judge.**

On May 4, 2011, plaintiff Sunil Samtani brought this action against defendants Ramakrishna Cherukuri and New York Fragrance, Inc. ("NYF"). In addition to several claims pursuant to 42 U.S.C. § 1983, Samtani brought two claims under New York state tort law—one claim for malicious prosecution and one claim for intentional infliction of emotional distress ("IIED"). All of Samtani's claims arose from his prosecution by the Richmond County District Attorney's Office (the "D.A.'s Office"). On May 11, 2012, this Court dismissed Samtani's federal claims for failure to state a claim upon which relief could be granted, see Fed. R. Civ. P. 12(b)(6), because defendants were not state actors. (Docket Entry ("D.E.") 26.) Samtani's state law claims were permitted to proceed, however, because this Court possessed subject matter jurisdiction over the parties based on diversity of citizenship, see 28 U.S.C. § 1332. (D.E. 29.)

Defendants now move for summary judgment on the state law claims. For the following reasons, the motion is denied with respect to the malicious prosecution claim but is granted with respect to Samtani's IIED claim.

## BACKGROUND

### I. The Parties' Business Dealings

Defendant NYF is a perfume wholesaler incorporated in New York and with its principal place of business in Staten Island, New York. (Complaint ("Compl.") ¶ 3; Deposition of Ramakrishna Cherukuri ("Cherukuri Dep.") at 23.) Defendant Cherukuri is the Chief Executive Officer and president of NYF. (Compl. ¶ 4; Cherukuri Dep. at 23-24.) Plaintiff Samtani owned Grande Perumeria, Inc., also a perfume wholesaler, from 2001 until 2006, when it was dissolved pursuant to Chapter 7 bankruptcy proceedings. (Deposition of Sunil Samtani ("Samtani Dep.") at 16-21.) This case arises from defendants' sale of perfume in bulk to Samtani and Grande Perfumeria, a business relationship that began in 2001. (Samtani Dep. at 21.) In total, the defendants sold Grande Perfumeria approximately $1.5 million worth of merchandise over about four years. (Recommendation for Dismissal ("RFD") at 6.)[1]

Samtani initially paid defendants for shipments check on delivery ("C.O.D."). (Cherukuri Dep. at 44-45.)[2] Around May 2001, however, defendants began accepting postdated checks from Samtani, effectively letting him make purchases on limited credit. (Id. at 67-68; Samtani Dep. at 27-29.) Both Cherukuri and Samtani indicated that this practice was not uncommon in the perfume industry. (Cherukuri Dep. at 67; Samtani Dep. at 31-32.) Then, at some point after 2002—by which time the parties had conducted twenty to thirty transactions—Cherukuri granted Samtani an "open account," which allowed Samtani to accumulate debt and pay it off as he

---

[1] The Recommendation for Dismissal, which is discussed at greater length below, is a document the prosecutor in the state prosecution of Samtani filed to recommend dismissal of the indictment against Samtani. The Recommendation for Dismissal lists information the state prosecutor felt undermined his case against Samtani. According to the prosecutor, Cherukuri had omitted that information both in discussions with the prosecutor and in his testimony before the grand jury. (RFD at 6-8.)

[2] Defendants and plaintiff disagree over whether defendants required Samtani to pay in full or to pay only half the value of a shipment upon delivery. (Cherukuri Dep. at 45 (claiming Samtani had to pay in full); Samtani Dep. at 25-26 (claiming Samtani only had to pay half).) At the summary judgment stage, the distinction is not material.

pleased. (Samtani Dep. at 49-50.) At peak, Samtani accumulated a balance of approximately $400,000. (Id.)

Over time, Samtani sent the defendants checks to pay off his balance. (Id. at 42-50.) However, around 2004, Grande Perfumeria encountered financial difficulties, and Samtani stopped payment on a number of postdated checks because the accounts on which they would draw contained insufficient funds to cover them. (Id. at 42-48.) As of December 2004, Samtani had reduced to $160,000 the balance owed to the defendants. (NYF Customer Ledger ("NYF Ledger") at 2.)

Grande Perfumeria's financial woes persisted, however, and in 2006, the company filed for Chapter 7 bankruptcy in the Southern District of Texas. Court records indicate that at least seven different notices were sent to NYF's business address, seeking to alert the company to the bankruptcy proceedings. (Declaration of Gerald M. Cohen ("Cohen Decl."), Exhibit ("Exh.") B, Bankruptcy Notices.) Cherukuri never appeared in the bankruptcy and denied having received the notices. (Cherukuri Dep. at 98-108.) At least one similarly situated creditor acknowledged having received by mail notice of the bankruptcy proceedings. (Deposition of Kanak Golia ("Golia Dep.") at 33-34.)

## II. Cherukuri and the District Attorney's Office

At some point in 2007, Cherukuri—either personally or through a representative— approached the D.A.'s Office in Richmond County to file a criminal complaint against Samtani. (Deposition of Om Kakani ("Kakani Dep") at 12-13.) Assistant District Attorney ("A.D.A.") Om Kakani was assigned to the case in May of that year, (id. at 9), and thereafter received a packet of information from an attorney representing Cherukuri, which purported to include "documents . . . concerning the alleged fraudulent scheme by which [Samtani] bilked" Cherukuri

3

and others "out of substantial sums of money." (Cohen Decl., Exh. C, Goodman & Saperstein Letter, July13, 2007 ("G & S Letter"); see also Kakani Dep. 17-18.) According to a letter that accompanied the documents, Samtani "instill[ed] credit confidence through placing small orders, paying for them, then submitting larger orders, paying on account of those orders, and finally not paying the large debit balances." (Cohen Decl., Exh. C, G & S Letter.) Among the documents was an independent forensic investigation demonstrating that Samtani owed defendants $160,000. (Kakani Dep. at 18.)

Kakani and Cherukuri met approximately five times in 2008. (Id. at 35.) During those meetings, Cherukuri told Kakani that he was having "a problem with a dealer in Texas who had taken items from him on credit and had never paid back those items." (Id. at 16.) He further told Kakani the following. Cherukuri first met Samtani in 2002, (see RFD at 2; Kakani Dep. at 25), and they had initially engaged in two small transactions C.O.D., (RFD at 3). Thereafter, Samtani asked the defendants to extend him credit for the next shipment, and Cherukuri obliged, dispatching three shipments in return for postdated checks. (Id. at 3; Kakani Dep. at 76-77, 222.) When, on the appointed date, Cherukuri attempted to cash the checks, they did not clear due to insufficient funds in Samtani's accounts. (RFD at 3-4.) Cherukuri never received payment for "$160,000 worth of products" he had shipped to Samtani between December 12, 2002 through May 15, 2005. (Id. at 4; see also Kakani Dep. at 21.)

Kakani testified at his deposition that, during their meetings, Cherukuri did not inform him of several facts relating to his business dealings with Samtani. Those facts included: (1) that there had been shipments made on credit besides the three shipments at issue, (Kakani Dep. at 29); (2) that Samtani had previously paid off approximately $240,000 of the debt he owed defendants, (id. at 34, 78); (3) that the Cherukuri-Samtani business relationship had started in

4

early 2001, rather than December 2002, (id. at 32); (4) that Samtani had paid for shipments with postdated checks as early as 2001, (id. at 84); (5) that the two parties had entered into a financing agreement regarding Samtani's outstanding debt, (id. at 57); and (6) that Samtani had filed for bankruptcy, (id. at 49-50). Kakani also testified that none of the documents provided to the D.A.'s Office by Cherukuri or his lawyers indicated the full extent of the parties' nearly $1.5 million in business dealings between 2001 and 2005. Instead, Kakani said, the documents showed only the transactions that led to the $160,000 debt. (Id. at 37.) However, a ledger provided the D.A.'s Office, (id. at 144-46), appears to indicate a total number of transactions worth more than $160,000, (NYF Ledger).

After receiving the complaint, the D.A.'s Office subpoenaed financial information from Samtani and conducted a forensic investigation. (Kakani Dep. at 128-30.) However, the office's investigation relied almost entirely on the records provided by Cherukuri. (Id. at 41, 184-86.) Cherukuri also put Kakani in contact with two other perfume wholesalers who Samtani owed money: Vinnie Chabra and Kanak Golia. (Id. at 43-47; see also Deposition of Vinnie Chabra at 46 (stating that Cherukuri had arranged the meeting).) Both men later testified before the grand jury that, like Cherukuri, they had shipped Samtani perfume on credit and never received payment. (Kakani Dep. at 45.) Finally, the D.A.'s Office sought to determine whether Samtani had filed for bankruptcy. However, Kakani searched only in New York, Georgia, and the Eastern District of Texas, and therefore never learned that Samtani had filed for bankruptcy in the Southern District of Texas. (RFD at 8.)

**III. The Grand Jury Proceedings**

In April 2009, Kakani put the case against Samtani before a Richmond County grand jury. (Kakani Dep. 36.) During the proceedings, Cherukuri testified as follows. He first met

Samtani in 2002 when Samtani came to NYF's offices and requested to buy perfume on credit. (Grand Jury Minutes ("GJM") at 16-17.) Cherukuri refused. Instead, he insisted Samtani pay prior to shipment. (Id. at 18.) After two shipments, Samtani sent him a check for a third shipment but asked him to "hold it one week." (Id.) Cherukuri agreed and permitted Samtani to pay for a few shipments with postdated checks. (Id. at 18-19.) When he attempted to cash the checks, "[a] lot of them bounced." (Id. at 19.) He then went on to describe a series of communications between him and Samtani in which he sought to obtain payment for the shipped merchandise. (Id. at 24-33.)

Kakani also placed before the grand jury a document provided by Cherukuri, which purported to show NYF's sales to Samtani. (NYF Ledger; see also Kakani Dep. at 145-46; Cherukuri Dep. at 140-41.) Cherukuri testified that the ledger contained the entirety of NYF's transactions with Samtani. (GJM at 21-24.) However, the ledger's first entry is for December 12, 2002, and it does not reflect any transactions prior to that date. (NYF Ledger at 1.) It further indicates that, by December 24, 2004, Samtani owed NYF $160,000. (Id. at 2.) The ledger notes (1) about twenty debits to Grande Perfumeria's account in 2002 and 2003, (2) approximately four dozen payments to NYF made by check, and (3) close to twenty checks that did not clear. (Id. at 1-2.) At one point in January 2004, the ledger indicates, Grande Perfumeria owed NYF over $350,000. (Id.)

The grand jury returned a two-count indictment against Samtani, which charged him with larceny and scheme to defraud, and a warrant was issued for his arrest. Samtani was arrested in Texas, posted bail, and later voluntarily surrendered to authorities in New York. (Samtani Dep. at 68-73.) Over the next fifteen months, Samtani had to fly to New York about nine times for court appearances. (Id. at 73.)

## IV. Post-Arrest Contacts Between Samtani and the Defendants

At some point following Samtani's arrest, he began communicating with Cherukuri and his associates as they apparently sought to negotiate a settlement that would discharge Samtani's outstanding debt to defendants. Although a settlement was never reached, a document identified as a proposed settlement agreement and signed by Cherukuri referred to "civil and criminal matters pending regarding this matter" and that "the parties desire to enter a settlement agreement in order to resolves these matters between them." (Cherukuri Dep. at 158-61 (emphasis added); see also Kakani Dep. at 69.) In addition, Samtani exchanged a series of text messages or e-mails with Cherukuri and employees of NYF that appear to suggest that the dismissal of criminal charges against Samtani played a part in settlement negotiations. (Kakani Dep. at 68-70; Samtani Dep. at 93-105; Cherukuri Dep. at 193-98.)[3] According to Samtani's mother, Rekha, in August 2009, the communications took a decidedly uncivil turn. In a sworn declaration, she alleged that Cherukuri called her shortly after Samtani's arrest and told her: "I will spend a million dollars to keep your son in jail if he does not pay me. I will drop the charges if your son pays me $30,000. Give your son $30,000 to pay me or he will go to jail." (Cohen Decl., Exh. N, Rekha Samtani Declaration ("Rekha Samtani Decl.") ¶¶ 8-10.) Cherukuri denied having made the call, but acknowledged that he knew Samtani's mother, who was also a business person, through "trade shows" and that the contemplated civil settlement with Samtani was for $30,000. (Cherukuri Dep. at 163-64.)

## V. Dismissal of the Indictment

After the indictment was handed up, Samtani's attorney provided Kakani with additional information concerning his client's business relationship with Cherukuri. (Kakani Dep. at 32-35.)

---

[3] Because the text of the communications is not in the record, the Court must rely on the deposition testimony of Kakani, Cherukuri, and Samtani, all of which discuss and quote parts of the communications.

Kakani claimed to have learned for the first time from those conversations (1) that the relationship began prior to December 2002, (2) that Samtani had paid off approximately $240,000 worth of his debt, and (3) that the parties had entered into a financing agreement. (Id.; RFD at 6-8.) In addition, Kakani did not learn of Samtani's bankruptcy filing until after securing the indictment. (Kakani Dep. at 54.) According to Kakani, he would not have put the case before the grand jury had he known the full extent of the Samtani's dealings with Cherukuri. (Id. at 88-89, 225.) That is because the information—in particular the previous business relationship, the financing agreement, and the fact that Samtani paid down a large part of his debt—undermined any inference Samtani had the requisite intent to deprive defendants of their property at the time they dispatched the shipments at issue. (Id. at 94-98.)

Kakani thereafter questioned Cherukuri about the new information. Cherukuri told the A.D.A. he thought the information was irrelevant to the D.A.'s Office. (Id. at 79.) Kakani said he did not believe Cherukuri intentionally withheld information in bad faith. (Id. at 211.)

On August 25, 2010, Kakani filed a recommendation that the indictment against Samtani be dismissed. (See RFD.) The filing cited several examples of newly discovered evidence that, Kakani wrote, undermined the ability of the D.A.'s Office to establish Samtani's guilt: (1) records indicating that Samtani's business relationship with NYF had begun in 2001 and included "a fruitful year-and-a-half of . . . purchases of merchandise on credit" without issue; (2) evidence that the business relationship consisted of nearly $1.5 million worth of transactions, only $160,000 of which remained unpaid; (3) documents indicating that NYF sold Samtani nearly $400,000 of merchandise on credit; (4) that Samtani had subsequently paid off approximately $240,000 of that debt; and (5) the fact of Samtani's bankruptcy filing. (Id. at 6-8 (emphasis in original).) Kakani concluded that Cherukuri's failure to disclose these facts "would

8

render suspect any testimony he would give" regarding both the larceny count and the scheme to defraud count. (Id. at 8.) He also noted that the newly discovered facts were inconsistent with the establishment of the requisite larcenous intent. (Id. at 7 nn.4-5.)

The indictment was subsequently dismissed. Although the charges were dropped, Samtani testified at his deposition that he suffered emotional stress from the criminal proceedings, including depression and insomnia. (Samtani Dep. at 111, 113.) He took some medication to cope with the stress, though he never saw a medical professional. (Id. at 110).

## VI. Procedural History

Samtani filed this action on May 4, 2011. On May 11, 2012, this Court dismissed Samtani's § 1983 claims on the ground that neither defendant was a state actor, as required to establish liability under that statute.[4] (D.E. 26.) The parties proceeded to discovery on the state law claims, and, on October 9, 2013, defendants filed the instant motion for summary judgment. (D.E. 40.) Oral argument was held before the Court on February 20, 2014. (See D.E. 53.)

## STANDARD OF REVIEW

Summary judgment is warranted where the record before the court shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A 'genuine issue' exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 498 (2d Cir. 2001). A court on summary judgment must draw reasonable inferences in the nonmoving party's favor. See

---

[4] The Court initially dismissed the state law claims as well, per its discretion to decline supplemental jurisdiction over state law claims when it dismisses all federal claims. However, because Samtani's complaint pleaded diversity of citizenship as a basis for jurisdiction, under 28 U.S.C. § 1332, (Compl. ¶ 8), the Court reinstated the state law claims following a motion for reconsideration, (D.E. 29).

Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). It is the "burden of the moving party to show initially the absence of a genuine issue concerning any material fact." Garanti Finansal Kialama A.S. v. Aqua Marine & Trading Inc., 697 F.3d 59, 73 n.18 (2d Cir. 2012) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). When the moving party shows the absence of a genuine issue of material fact, the burden shifts to the non-moving party to demonstrate the presence of such an issue. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 474, 586 (1986). The nonmoving party cannot rest on mere allegations or denials but must instead come forward with specific facts showing that there is a genuine issue for trial. See Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citing Matsushita, 475 U.S. at 587). The Court may consider materials in the record other than those cited by the parties. Fed. R. Civ. P. 56(c)(3).

## DISCUSSION

### I. Malicious Prosecution

In order to establish a claim of malicious prosecution under New York law, a plaintiff must satisfy four elements: "(1) [that] the defendant either commenced or continued a criminal proceeding against him; (2) that the proceeding terminated in his favor; (3) that there was no probable cause for the criminal proceeding; and (4) that the criminal proceeding was instituted with actual malice." Posr v. Doherty, 944 F.2d 91, 100 (2d Cir. 1991) (internal quotation marks omitted); see also Smith-Hunter v. Harvey, 95 N.Y.2d 191, 195 (2000).[5] Defendants do not dispute that the criminal proceedings in this case terminated in Samtani's favor. (Defendants'

---

[5] The elements "are substantially the same" as those for a claim of malicious prosecution under 42 U.S.C. § 1983. Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003) (internal quotation marks omitted). Therefore, the Court may rely on cases applying either state tort law or federal law under §1983.

Memorandum of Law in Support of the Motion for Summary Judgment ("Def. Mem.") at 4.)[6] The other three elements, however, remain in dispute. The Court finds that there remain genuine issues of material fact as to each element and therefore denies summary judgment on this claim.

## A. Commencement of Criminal Proceedings

First, the parties disagree whether Kakani or Cherukuri commenced criminal proceedings against Samtani. (See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Mem.") at 14-20; Def. Mem. at 5.) The record reveals triable issues with respect to this element of the claim.

It is "well settled" that the "mere reporting of a crime to police and giving testimony are insufficient" to satisfy the commencement element of a malicious prosecution claim. Rohman v. N.Y.C. Transit Auth., 215 F.3d 208, 217 (2d Cir. 2000) (quoting DeFilippo v. County of Nassau, 583 N.Y.S.2d 283, 284 (2d Dep't 1992)). On the other hand, "New York law has long equated the civil defendant's failure to make a full and complete statement of the facts to the District Attorney or the court, or holding back information that might have affected the results, with that defendant's initiation of a malicious prosecution." Ramos v. City of New York, 729 N.Y.S.2d 678, 690 (1st Dep't 2001); see also Robles v. City of New York, 961 N.Y.S.2d 533, 535 (2d Dep't 2013) (denying summary judgment where "triable issues of fact" existed as to whether defendants "intentionally provided false information to law enforcement officials or withheld material information"); Bonfante v. Golub Corp., 587 N.Y.S.2d 797, 798 (3d Dep't 1992) (stating that commencement element could be satisfied by proof defendants "falsified or withheld information" in order to "procure" prosecution).

---

[6] The New York Court of Appeals has spoken clearly on this point. Dismissal—even without prejudice—"qualifies as a final, favorable termination if the dismissal represents the formal abandonment of the proceedings by the public prosecutor." See Stampf v. Long Island R. Co., 761 F.3d 192, 200 (2d Cir. 2014) (quoting Smith-Hunter, 95 N.Y.2d at 195) (internal quotation marks omitted). Here, Kakani executed just such a "formal abandonment." (See RFD.)

A prosecutor's independent judgment may sever the chain of causation between the actions of a complaining witness and the decision to prosecute. Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999). However, "the public prosecutor's role in a criminal prosecution will not necessarily shield a complaining witness from subsequent civil liability where the witness's testimony is knowingly and maliciously false" and that testimony "caused" officials to prosecute, White v. Frank, 855 F.2d 956, 962 (2d Cir. 1988), or where that witness "misled . . . the official who could be expected to exercise independent judgment." Townes, 176 F.3d at 147.

Here, defendants argue (1) that Cherukuri did not willfully misrepresent or withhold information material to the decision to prosecute Samtani, and (2) that there is no causal link between whatever information Cherukuri provided or did not provide prosecuting authorities and the charging decision. (Def. Mem. at 5-8; Defendants' Memorandum of Law in Reply and in Further Support of the Motion for Summary Judgment at 1-5.) Defendants make the latter argument in four ways: (1) Cherukuri never expressed a desire to have Samtani arrested or prosecuted; (2) even if he had, that desire was not a factor Kakani considered when he decided to bring charges; (3) Cherukuri acted at his lawyer's behest; and (4) Kakani's decision to seek an indictment was "an intervening and independent action." (Def. Mem. at 5.) Plaintiff responds that there are triable issues of fact as to both issues. (Pl. Mem. at 14-20.)

Either Cherukuri or his attorneys initially brought Samtani's conduct to the attention of the D.A.'s Office. (See Cherukuri Dep. at 119-22; Kakani Dep. at 14-16.) That alone cannot satisfy the commencement element. See Rohman, 215 F.3d at 217. However, the record—when read, as it must be on summary judgment, in the light most favorable to plaintiff—reveals several instances in which a jury could find Cherukuri misrepresented or omitted material facts in his

discussions with Kakani. Those include: (1) mischaracterizing the timing and course of defendants' business dealings with Samtani, (Kakani Dep. at 93-103, 204-05); (2) failing to disclose that Samtani and defendants had entered into a debt restructuring plan, (id. at 57); (3) neglecting to mention that Samtani had paid down $240,000 of the $400,000 he at one time owed defendants, (id. at 78; RFD at 6);[7] and (4) not mentioning that Samtani's company had entered bankruptcy after attempting to pay down its debts to defendants, (Kakani Dep. at 50-55; RFD at 7-8).[8]

Moreover, a jury could reasonably find that these alleged omissions and misrepresentations were willfully made. The letter Cherukuri's attorneys initially sent Kakani portrayed Samtani as a perfume industry confidence man. (Cohen Decl., Exh. C, G & S Letter.) A jury could interpret Cherukuri's actions to constitute selective disclosure meant to perpetuate that portrayal, (see, e.g., RFD at 7-8 n.4 (noting that disclosure of omitted information would have undermined picture of Samtani as con man); Kakani Dep. at 94-98 (same)), with an eye toward using Samtani's indictment as leverage in debt repayment negotiations, (see Cherukuri Dep. at 161, 193-98 (discussing communications and proposed settlement document that could be read to suggest criminal proceedings were a bargaining chip in debt repayment settlement

---

[7] The NYF ledger defendants provided to Kakani shows a large number of transactions between the parties. It also shows that plaintiff had paid off a good deal of what he owed defendants. (NYF Ledger.) However, for two reasons, the ledger does not vitiate the significance of Kakani's claim that Cherukuri omitted important details of his business dealings with Samtani. First, Kakani testified that Cherukuri told him a large number of the recorded transactions constituted a single shipment, which would render the total sales to Samtani in the single digits. (Kakani Dep. at 76-77, 219-22.) Second, by omitting 2001 and most of 2002, the ledger does not reveal the full scope of the business relationship between Samtani and defendants, an omission Kakani considered "a fairly big error" that affected the decision to prosecute. (Id. at 48-49, 219; RFD 6-8 & n.5.)

[8] Plaintiff and defendants dispute whether Cherukuri was aware of the ongoing bankruptcy proceedings. (See Plaintiff's Response to Defendants' Local Rule 56.1 Statement ("Pl. Resp. to Def. R. 56.1") ¶ 14.) Cherukuri's knowledge of the bankruptcy proceedings is a question of fact that the Court cannot here resolve. However, construing the record in plaintiff's favor, a jury reasonably could find—Cherukuri's protestations to the contrary notwithstanding, (see Cherukuri Dep. at 178)—that defendants did have notice of the bankruptcy, (see Cohen Decl., Exh. B, Bankruptcy Notices (evidence bankruptcy notices served on defendants); Golia Dep. at 33 (other creditor similarly situated to defendants received notice of bankruptcy)).

negotiations); Samtani Dep. at 95-105 (same); Kakani Dep. at 68-70 (same); see also Rekha Samtani Decl. ¶¶ 8-10 (alleging Cherukuri sought to use Samtani's prosecution to extract $30,000 from Samtani's mother)).[9]

As to causation, the record contains sufficient evidence for a jury to find that Cherukuri's alleged omissions and misrepresentations caused Kakani to put Samtani's case before the grand jury.[10] Kakani testified at his deposition that the investigation relied almost entirely on information provided by defendants, including documentary evidence submitted by defendants or attorneys acting on their behalf.[11] (Kakani Dep. at 41, 184-86.) Kakani also stated that without Cherukuri's testimony prosecution by his office would not have been possible. (Id. at 132-33.) That Kakani recommended dismissal after he became aware of the apparent holes in the information Cherukuri initially provided, (RFD at 7-8 & nn.4-5), underscores the significance of Cherukuri's omissions and misrepresentations.

Lastly, the Court notes that the information provided—or withheld—by Cherukuri was not merely an inconsequential ripple in a sea of compelling evidence against Samtani. It is true that when a "criminal charge is the culmination of a lengthy investigation involving various

---

[9] Defendants urge the Court not to consider the Rekha Samtani Declaration on summary judgment because it would be inadmissible at trial. Whether the declaration itself would be admissible at trial is not the relevant inquiry at the summary judgment stage. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Defendants do not indicate why, if Rekha Samtani testified at trial to the substance of her declaration, her testimony would be inadmissible. Defendants also claim the declaration "raises a feigned issue of fact . . . whose sole purpose is to defeat a motion for summary judgment." (James F. Burke Declaration in Reply to Plaintiff's Opposition and in Further Support of Defendants' Motion for Summary Judgment ¶ 17.) The Court reads their argument to invoke Federal Rule of Civil Procedure 56(h). The argument nevertheless fails. Defendants offer no evidence that the Rekha Samtani Declaration was "submitted in bad faith or solely for delay . . . ." Fed. R. Civ. P. 56(h).

[10] To the extent the grand jury's decision to return an indictment could constitute an intervening cause, the Court notes that, in his grand jury testimony, Cherukuri did not cure the omissions and misrepresentations that allegedly infected his discussions with Kakani. See Part I.B. infra.

[11] Most of what defendants call Kakani's "two year investigation," (Def. Mem. at 5), relied on information provided by defendants, (Kakani Dep. at 41). Kakani's action sheet, which defendants put into the record, does nothing to contradict the A.D.A.'s testimony on this point. (Burke Decl., Exh. O, Kakani Action Sheet.)

14

sources of evidence, the mere fact that a witness provided false information to the government does not warrant a conclusion that the witness initiated the prosecution where the rest of the evidence suggests otherwise." Rothstein v. Carriere, 373 F.3d 275, 294-95 (2d Cir. 2004) (holding defendant did not, as a matter of law, commence prosecution when indictment resulted from complex six-year investigation and prosecutor's testimony minimized significance of defendant's role in indictment). But here, the investigation began and ended with Cherukuri,[12] and the prosecutor—far from disavowing defendants' role in commencing Samtani's prosecution—has testified that defendants were absolutely essential to commencement.

Finally, defendants' other causation claims miss the point. It is largely irrelevant that Cherukuri never asked for Samtani to be arrested and prosecuted. The same is true of Kakani's statement that he would not have relied on such a request in making his charging decision. The relevant inquiry is the extent to which the information Cherukuri supplied—rather than his expressed wishes—was essential to Kakani's decision. See White, 855 F.2d at 962.

In sum, triable issues of fact remain as to the commencement element.

**B. Probable Cause**

Second, the parties disagree whether there exist genuine issues of material fact regarding the absence of probable cause. (Pl. Mem. at 22-28; Def. Mem. 8-9.) For the following reasons, the Court determines that such issues do exist.

"[I]n cases in which the grand jury has returned an indictment, there is a presumption of probable cause . . . ." Grucci, 20 N.Y.3d at 898. "The presumption may be overcome only by

---

[12] Defendants' claim that Cherukuri acted at his lawyer's behest is, at best, a disputed fact. Kakani testified that he understood defendants' attorneys to be acting on behalf of defendants, not the other way around, (Kakani Dep. at 15, 185), and Cherukuri insisted that nobody directed him to supply Kakani with the allegedly misleading or incomplete information, (Cherukuri Dep. at 214-16). Regardless, insofar as defendants blame their lawyers, clients are liable under New York agency law as principals for the tortious acts of their lawyers when the lawyers act within the scope of their employment or actual or apparent authority. See Chevron Corp. v. Donziger, 974 F. Supp. 362, 566 n.1304 (S.D.N.Y. 2014). There is no suggestion in this case that the lawyers acted otherwise.

evidence establishing that the [defendants] have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." Rothstein, 373 F.3d at 283 (quoting Colon v. City of New York, 60 N.Y.2d 78, 82-83 (1983)). Whether the statement of facts is made to the prosecutor or the grand jury, it must have so compromised the grand jury proceedings that it "erode[d]" the premise that the grand jury acted in its regular judicial capacity when it returned the indictment against the plaintiff. Id. at 284 (citing Colon, 60 N.Y.2d at 82). The plaintiff bears the burden of rebutting the presumption of probable cause. Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003). To meet that burden, the plaintiff must produce "evidence sufficient for a reasonable jury to find that his indictment was procured as a result of . . . conduct [by defendants] undertaken in bad faith." Id. at 73. "Mere 'conjecture' and 'surmise'" will not suffice. Id. Plaintiff must show "intentional or knowing conduct on the part of a defendant." Lupski v. Cnty. of Nassau, 822 N.Y.S.2d 112, 114 (2d Dep't 2006). Burden shifting notwithstanding, all reasonable inferences should be drawn in favor of the plaintiff. McClellan v. Smith, 439 F.3d 137, 146 (2d Cir. 2006).

Neither party disputes that Samtani was indicted by a Richmond County grand jury. (Pl. Resp. to Def. R. 56.1 ¶ 7 (disputing defendants' description of indictment but not disputing fact of indictment).). Therefore, Samtani bears the burden of rebutting the presumption of probable cause. On the record before the Court—when viewed in aggregate and in the light most favorable to Samtani—he meets that burden.

First, the grand jury minutes reveal omissions and misrepresentations in Cherukuri's testimony. Cherukuri claims that Samtani paid for smaller perfume shipments up front "[a] couple of times" before increasing his purchase volume and asking to buy on credit. (GJM at 18-

16

19.) Cherukuri also told the grand jury, twice, that his business relationship with Samtani began in late 2002. (Id. at 16, 23.) Corroborating this misleading claim was the NYF ledger, which was put before the grand jury and indicated—incorrectly—that NYF first did business with Samtani's company on December 12, 2002. (NYF Ledger at 1; see also GJM at 22.) In truth, their business relationship started about twenty months earlier. (Cherukuri Dep. at 50.) Although early on Samtani paid for shipments C.O.D., by May 2001—well over a year and a half before Samtani began to bounce and cancel checks—Cherukuri had started to accept payment for shipments in the form of postdated checks. (See Samtani Dep. at 27-29; Cherukuri Dep. at 67-68.) Both men acknowledge that payment by postdated check was a common practice in the perfume industry. (Samtani Dep. at 31-32; Cherukuri Dep. at 67.) Cherukuri also omitted from his grand jury testimony several aspects of his business relationship with Samtani. Those omissions included: (1) that Samtani had agreed to a debt restructuring plan to pay down his debt, (RFD at 6-7; Kakani Dep. at 57); (2) that, pursuant to the restructuring plan, Samtani had paid down $240,000 worth of debt, (RFD at 6; Kakani Dep. at 78);[13] and (3) that Samtani's company had entered Chapter 7 bankruptcy after paying defendants $240,000 of the $400,000 owed them, (RFD at 7; Kakani Dep. at 54).

Second, Cherukuri made many of the same omissions in his discussions with Kakani. (See, e.g., Kakani Dep. at 50-55 (bankruptcy), 57 (debt restructuring plan), 78 (debt repayment), 93-103 (scope of business relationship), 204-05 (same).) Also, as before the grand jury, he misrepresented his business relationship with Samtani. When asked by Kakani, Cherukuri

---

[13] The ledger put before the grand jury does, as defendants argue, reflect efforts by plaintiff to pay down his debt to defendants. (NYF Ledger at 2.) To be sure, that diminishes the relevance of the omission of the fact that Samtani had paid down part of his debt. However, the ledger does not reflect that plaintiff made those payments as part of a debt restructuring plan. It is that restructuring plan that "severely hamper[ed] the People's ability to prove a larcenous intent by [Samtani] at the time the property was taken." (RFD at 7 (emphasis in the original).)

17

claimed there were no transactions between him and Samtani prior to 2002. (Id. at 48-49.) Although the core question here is the effect of defendants' conduct on the grand jury, see Rothstein, 373 F.3d at 284, Cherukuri's testimony—as defense counsel emphasized at oral argument—was limited by Kakani's line of inquiry, (see D.E. 53 at 10). Kakani's line of inquiry, in turn, was limited by what Cherukuri had told him—or failed to tell him—in earlier discussions.[14]

These alleged misrepresentations or omissions, when construed in plaintiff's favor, were clearly material to the grand jury's determination. For one, Kakani stated in his deposition that he likely would not have put the case before the grand jury had he known about the debt restructuring plan, the full scope of plaintiff and defendants' business relationship, and the bankruptcy. (Kakani Dep. at 88.) The Recommendation for Dismissal and Kakani's deposition testimony speak to the various ways the above-referenced omissions and misrepresentations undermined the intent element of the larceny count. (RFD at 7 nn. 4-5; Kakani Dep. at 93-103.)

Defendants argue that Cherukuri's testimony was not material because he was only one of three grand jury witnesses. (Def. Mem. at 9.) Although it is true that three witnesses testified with respect to the scheme to defraud count, Cherukuri was the sole witness for the larceny count. (Kakani Dep. at 134-35.) Furthermore, Kakani deemed Cherukuri's testimony sufficiently central to the scheme to defraud count that he sought to dismiss that charge once he learned of the deficiencies in the information Cherukuri had provided him and the grand jury. (RFD at 8.) Even if that were not so, the Second Circuit has held that, in analyzing the probable cause element of a malicious prosecution claim, distinct charges should be considered separately. Posr, 944 F.2d at 100. Assuming, for the sake of argument, that Cherukuri's testimony was not

---

[14] Again, according to Kakani, his investigation relied almost entirely on information provided by Cherukuri. (Kakani Dep. at 41, 184-86.)

material to the scheme to defraud count, that conclusion would have no bearing on the materiality of his testimony to the larceny count.

Finally, the plaintiff has produced evidence sufficient for a jury reasonably to find that Cherukuri's alleged omissions and misrepresentations were intentional and made in bad faith. A jury could find that Cherukuri chose to omit or misrepresent facts that did not support the theory of criminal liability conveyed to Kakani by Cherukuri's attorneys—that Samtani "bilked [defendants] out of substantial sums of money" by "instilling credit confidence through placing small orders, paying for them, then submitting larger orders, paying on account of those orders, and finally not paying the large debit balances." (Cohen Decl., Exh. C, G & S Letter.) The alleged omissions and misrepresentations—interpreted in the manner most favorable to plaintiff—lend credence to the theory that Cherukuri falsely portrayed Samtani as having defrauded defendants. In addition, a jury could reasonably find that Cherukuri's alleged omissions and misrepresentations to Kakani and the grand jury were part of a calculated strategy to convert criminal legal processes into tools of debt collection. (See Cherukuri Dep. at 161, 193-98 (discussing communications and settlement documents that a jury could construe to be evidence defendants used indictment as leverage in debt settlement negotiations with Samtani); Samtani Dep. at 95-105 (same); Kakani Dep. at 68-70 (same); see also Rekha Samtani Decl. ¶¶ 8-10 (alleging Cherukuri sought to use Samtani's prosecution to extract $30,000 from Samtani's mother).) Defendants' arguments rebutting an inference of intent and bad faith—that Cherukuri did not understand the relevant criminal charges, (Def. Mem. at 7); that he misunderstood what was he being asked, (D.E. 53 at 15-16); that he did not think the information he omitted was relevant, (Declaration in Support of Motion for Summary Judgment ("Burke Decl.") ¶ 70)—raise

exactly the kinds of factual disputes a jury, and not a court on summary judgment, is meant to decide.

### C. Actual Malice

Lastly, defendants have not carried their burden with respect to actual malice because the record reflects triable issues of fact as to that element.

Under New York law, the actual malice element of a malicious prosecution claim does not require proof that the defendant was motivated by "actual spite or hatred, but means only 'that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996) (quoting Nardelli v. Stamberg, 44 N.Y.2d 500, 502-03 (1978)). "Once [a court] find[s] an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact . . . . A lack of probable cause generally creates an inference of malice." Boyd v. City of New York, 336 F.3d 72, 78 (2d Cir. 2003).

Defendants argue that Cherukuri did not approach Kakani with "a wrong or improper motive," but rather "in an effort to collect money owed to him by plaintiff." (Def. Mem. at 6.) Samtani counters by pointing to his mother's sworn statement that Cherukuri called her shortly after her son's arrest and sought to use Samtani's criminal prosecution to extract $30,000 from her. (Pl. Mem. 28-29; see also Rekha Samtani Decl. ¶¶ 8-10.) Samtani also relies on the inference of malice raised by the existence of triable issues of fact as to probable cause. (Pl. Mem. at 29-30.)

The first argument raises a close question. Statements made by Kakani, whose deposition testimony and Recommendation for Dismissal represent a significant part of the evidence provided by disinterested third parties, suggest he was largely—but not entirely—of the

opinion that Cherukuri honestly believed he had provided all the information about Samtani's alleged conduct relevant to the D.A.'s Office. (See, e.g., Kakani Dep. at 79 (Cherukuri "thought [omitted information] was irrelevant for the purposes of the DA's Office."); RFD at 8 ("It is the People's position that . . . [Cherukuri] believed that the information that he initially provided to this office consisted of all the information relevant to this investigation."); but see Kakani Dep. at 219 (referring skeptically to Cherukuri's alleged mischaracterization of his business relationship with Samtani as "a fairly big error").) A finding that Cherukuri honestly believed he had provided the information necessary would undercut a conclusion that he acted with actual malice.

Kakani's opinion, however, is not dispositive. A jury could reasonably reach a different conclusion than he did about Cherukuri's state of mind based on Kakani's testimony as a whole and Cherukuri's statements before the grand jury. Cherukuri's alleged misrepresentations and omissions constitute circumstantial evidence that he was acting with something other than a proper motive, given that the facts misrepresented or omitted were precisely those that undermined a finding that Samtani possessed the requisite criminal intent. See Rounseville v. Zahl, 13 F.3d 625, 630 (2d Cir. 1994) ("New York courts recognize that actual malice can rarely be established through direct evidence and thus may be proven through circumstantial evidence."). Second, the affidavit from Samtani's mother is direct evidence of Cherukuri's improper motive for seeking prosecution of Samtani. Her testimony suggests defendants sought Samtani's indictment in order to improve their negotiating position in debt settlement talks. That interpretation of her testimony finds some corroboration in the Texas settlement agreement and text message or e-mail exchanges between Samtani and Cherukuri and his associates subsequent to Samtani's arrest. (See Cherukuri Dep. at 161, 193-98; Kakani Dep. at 68-70; Samtani Dep. at

93-105.) Lastly, Samtani has raised a triable issue of fact as to whether there was probable cause for his prosecution. See supra Part I.B. If he is able to establish a lack of probable cause, a jury would be entitled to infer that Cherukuri acted with malicious intent. Boyd, 336 F.3d at 78.

* * *

For the foregoing reasons, Samtani has raised genuine issues of material fact as to each element of a malicious prosecution claim under New York law. Accordingly, Cherukuri's motion for summary judgment on the malicious prosecution claim is denied.

## II. Intentional Infliction of Emotional Distress

In New York, an IIED claim consists of four elements: (1) extreme and outrageous conduct; (2) intent to cause—or disregard of a substantial probability of causing—severe emotional distress; (3) severe emotional distress; and (4) a causal link between the defendant's conduct and plaintiff's severe emotional distress. Howell v. N.Y. Post Co., 81 N.Y.2d 115, 121 (1993). Defendants raise three grounds for granting summary judgment on Samtani's intentional infliction of emotional distress ("IIED") claim: (1) that Samtani's claim is barred by the statute of limitations; (2) that Samtani has failed to substantiate his claim with medical evidence as required by New York law; and (3) that Samtani has not made a showing of the necessary extreme and outrageous conduct to constitute such a claim. A finding in defendants' favor on statute of limitations grounds or medical evidence grounds would justify granting defendants' motion for summary judgment on Samtani's IIED claim. Because the Court finds defendants' arguments on both grounds persuasive, it need not reach defendants' third argument.

### A. Statute of Limitations

First, plaintiff's IIED claim is time barred. Under New York law, IIED claims are governed by a one-year state of limitations. See Robles v. Cox & Co., 841 F. Supp. 2d 615, 630

(E.D.N.Y. 2012) (citing N.Y.C.P.L.R. § 215(3)). Here, the action was filed on May 4, 2011. (D.E. 1.) To be timely, the claim would have had to have accrued on or after May 4, 2010. "[C]ertain wrongs are considered to be continuing wrongs, and the statute of limitations, therefore, runs from the commission of the last wrongful act," bringing within the limitations period acts otherwise outside it. Leonhard v. United States, 633 F.2d 599, 613 (2d Cir. 1980) (quoting N.Y.C.P.L.R. § 203 note). In the IIED context, New York courts have permitted "plaintiff[s] to rely on wrongful conduct occurring more than one year prior to commencement of the action, so long as the final actionable event occurred within one year of the suit." Shannon v. MTA Metro-North R.R., 704 N.Y.S.2d 208, 209 (1st Dep't 2000); see also Drury v. Tucker, 621 N.Y.S.2d 822, 822 (4th Dep't 1994) (finding IIED claim not time barred based on continuing wrong theory). "[F]or continuing wrong theory to apply at all, a plaintiff must establish a prima facie claim of [IIED] that occurred within the statute of limitations period." Moultrie v. VIP Health Care Servs., No. 08-cv-457, 2009 WL 750219, at *7 (E.D.N.Y. Mar. 19, 2009) (citing Mariani v. Consol. Edison Co. of N.Y., Inc., 982 F. Supp. 267, 273-74 (S.D.N.Y. 1997)).

Defendants argue that, with discovery complete, there exists no evidence that they "had any involvement" with plaintiff's prosecution beyond testifying before the grand jury on April 9, 2009. (Def. Mem. at 10.)[15] The only counterargument put forth by plaintiff that merits consideration is that the continuing wrong theory applies because Cherukuri had "multiple

---

[15] Defendants' summary judgment motion dates the testimony to April 23, 2009, (Def. Mem. at 10), the date on which Samtani was indicted, (Burke Decl., Exh. M-1, Samtani Indictment at 8). However, the grand jury testimony itself bears the date April 9, 2009, (GJM at 1), a date that neither party disputes, (see Cherukuri Dep. at 128). This discrepancy likely reflects a mix-up on defendants' part. The point is academic. For statute of limitations purposes, relying on either date yields the same result.

conversations" with Kakani "throughout the prosecution until immediately prior to its dismissal." (Pl. Mem. at 35 n.7 (emphasis in original).)[16]

Plaintiff insists there were "multiple conversations" between Cherukuri and Kakani throughout his prosecution. But simply saying it is so does not render that statement an "inference . . . reasonably suggest[ed]" by the record. (See id.) In fact, plaintiff can arrive at such an "inference" only by mischaracterizing Kakani's deposition testimony. Samtani asserts: (1) that Kakani "had '<u>multiple conversations</u>' with Mr. Cherukeri [sic] throughout the District Attorney's investigation," (Pl. Resp. to Def. R. 56.1 ¶ 2 (emphasis in the original)); (2) that Kakani spoke with Cherukuri "personally 'at least five times if not more,'" (Pl. Mem. at 4); and (3) that Kakani "had 'numerous conversations' with [Cherukuri]" after, as well as before, Samtani's indictment, (<u>id.</u>).

These assertions are not supported by the record. In his deposition, Kakani answered "[c]orrect" when plaintiff's attorney asked, "Throughout 2008, you had had multiple conversations with Mr. Cherukuri, correct?" (Kakani Dep. at 35.) In response to the immediate follow-up question, Kakani estimated that he had been in contact with Cherukuri "at least five

---

[16] Plaintiff also argues (1) that the malicious prosecution and IIED claim are so inextricably linked that the latter tort is not complete until the former is too, (Pl. Mem. at 36), and (2) that the IIED tort was not complete until Kakani moved to dismiss the indictment, which revealed that Cherukuri "had <u>in fact</u> lied" about his relationship with Plaintiff, (<u>id.</u> at 37 (emphasis in original)). Neither argument has any merit. Plaintiff's first contention relies on <u>Llerando-Phipps v. City of New York</u>, 390 F. Supp. 2d 372 (S.D.N.Y. 2005). (Pl. Mem. at 36.) In that case, the plaintiff brought IIED and malicious prosecutions claims against New York police officers who he alleged had wrongfully arrested him and sought to have him indicted. <u>Llerando-Phipps</u>, 390 F. Supp. 2d at 375-76, 384. The court stated that the plaintiff "could not have brought his [IIED] claim until the charges against him were finally dropped . . . ." <u>Id.</u> at 384. That conclusion is puzzling. Although a malicious prosecution claim requires that criminal proceedings terminated in plaintiff's favor, <u>Smith-Hunter</u>, 95 N.Y.2d at 195, that is not an element of an IIED claim, <u>Howell</u>, 81 N.Y.2d at 121. Plaintiff's second contention relies on <u>Dana v. Oak Park Marina, Inc.</u>, 660 N.Y.S.2d 906 (4th Dep't 1997). In that case, the plaintiff's emotional distress arose when she learned that defendants had secretly videotaped her undressing in a women's dressing room. <u>Id.</u> at 911. To the extent Samtani experienced severe emotional distress, its source was his indictment, arrest, and prosecution—not discovering Cherukuri's alleged deceit. (See Samtani Dep. at 112-13.) He learned of his indictment, at the absolute latest, on August 13, 2009, the date of his arrest. (Pl. Response to Def. R. 56.1 ¶ 11.) That date falls several months outside the limitations period.

times if not a little bit more." (Id.) In context, it is clear that the "multiple" or "at least five" conversations plaintiff emphasizes took place in 2008. Plaintiff's contention that Kakani said these conversations went on "throughout [his] investigation"—implying that some of them took place on or after May 4, 2010—lacks support in the record.

As for the "numerous conversations" before and after Samtani's indictment,[17] Kakani— on and around the pages of his deposition transcript cited by plaintiff—mentions only four post-indictment contacts: two electronic contacts with Cherukuri's associates and two conversations with Cherukuri himself.[18] However, of those interactions, only one suggests that Cherukuri communicated with Kakani after May 4, 2010.[19] In that conversation, Kakani asked Cherukuri about the previously misrepresented or omitted facts of his business relationship with Samtani. (Kakani Dep. at 78-80.) That conversation could plausibly have occurred after May 4, 2010, but before Kakani moved to dismiss the indictment against Samtani, on August 25, 2010. However, the date of the conversation itself cannot serve as the accrual date. Nothing about the conversation constituted extreme or outrageous conduct. Kakani knew, at that point, what information Cherukuri had misrepresented or omitted, and Cherukuri appears to have acknowledged that he did not initially share the information. (See id. at 79-80, 99.) Given that the sole conduct within the statute of limitations period is neither extreme nor outrageous, the

---

[17] Plaintiff puts quotation marks around "numerous conversations" in his memorandum of law and cites to Kakani's deposition testimony. (Pl. Mem. at 4.) No such phrase exists on the pages cited. (See Kakani Dep. at 35, 69-70, 78-79.) Nor does it exist anywhere else in the deposition transcript.

[18] Elsewhere, Kakani notes that he and Cherukuri "had spoken throughout 2008 into 2009" and that he considered one conversation within that timeframe to be one of "our later meetings." (Kakani Dep. at 24.) None of the meetings described by Kakani fall after May 4, 2010. That Kakani considered a 2009 meeting a "later meeting[]" runs counter to any inference that he communicated substantially with Cherukuri into 2010.

[19] The other interactions were: (1) an employee of defendants' forwarded to Kakani a series of text messages or e-mails, apparently between Samtani and Cherukuri, (Kakani Dep. at 68-70), the transmission of which defendants' attorney—during Samtani's deposition—appears to date to August 27, 2009, (Samtani Dep. at 93); (2) a fax from a Texas-based lawyer representing Cherukuri, (Kakani Dep. at 74-76, 81-82), which appears to have been sent prior to the communications forwarded to Kakani in August 2009, (see Cherukuri Dep. at 196); and (3) a conversation between Kakani and Cherukuri on "the Wednesday preceding January 19, 2009," (Kakani Dep. at 71-72).

continuing wrong theory does not apply. See Shannon, 704 N.Y.S.2d. at 209; Moultrie, 2009 WL 750219, at *7.

At the Rule 12 stage of this case, the Court declined to dismiss Samtani's IIED claim as time barred. The Court noted that although Cherukuri testified before the grand jury on April 9, 2009—over two years before plaintiff commenced this action, on May 4, 2011—the continuing wrong theory allowed the claim to survive a motion to dismiss. At that stage of the proceedings, it was unclear to what extent Cherukuri participated in the prosecution of Samtani after the grand jury handed up the indictment. See Samtani v. Cherukuri, No. 11-cv-2159, 2012 WL 1821413, at *2 (E.D.N.Y. May 18, 2012).

That is no longer the case. With discovery complete, the record supports defendants' contention that plaintiff filed his complaint well after the statute had run. Plaintiff has adduced no "specific facts" showing there is a genuine issue of material fact as to whether the limitations clock started ticking at a late enough juncture to save his claim. See Caldarola, 298 F.3d at 160. Accordingly, the Court now dismisses Samtani's IIED claim as untimely.

### B. Medical Substantiation

Even if plaintiff's IIED claim were not time barred, summary judgment would nevertheless be appropriate because plaintiff has not provided medical evidence to substantiate his alleged emotional distress. Plaintiff does not argue that he has provided sufficient medical evidence to survive summary judgment. Instead, he disagrees with defendants' contention that New York law requires it. Plaintiff asserts that "there is simply no authority for the anomalous proposition that medical evidence is required to press a claim for IIED." (Pl. Mem. at 34.) He cites some cases that support his position. See, e.g., Williams v. Muhammad's Holy Temple of Islam, Inc., No. 00-cv-1251, 2006 WL 297448, at *3 n.5 (E.D.N.Y. Feb. 8, 2006) ("It is well-

settled that New York courts do not require medical evidence in order to establish the third and fourth elements of [IIED].").

However, the Court finds that plaintiff overstates his position. In fact, there is a split among the courts of the Appellate Division on the issue of medical substantiation in IIED claims. The First, Second, and Third Departments require medical evidence for IIED claims to survive summary judgment. See Cusimano v. United Health Servs. Hosps., Inc., 937 N.Y.S.2d 413, 418 (3d Dep't 2012) (affirming summary judgment dismissing IIED claim for lack of medical evidence); Dankner v. Steefel, 850 N.Y.S.2d 618, 619 (2d Dep't 2008) (dismissing IIED claim for plaintiff's failure to meet burden of proof, "particularly given the absence of any expert testimony in support of her emotional distress claims"); Milan v. City of New York, 791 N.Y.S.2d 419, 420 (1st Dep't 2005) (affirming dismissal of IIED claim because "plaintiff failed to support any of her claims with medical evidence"). However, the Fourth Department has broken with the other departments recently and held that medical evidence is not required for an IIED claim to survive summary judgment. See Zane v. Corbett, 919 N.Y.S.2d 625, 629 (4th Dep't 2011).

"[I]n deciding a disputed issue of state law in a diversity case, a federal [trial] court should attempt to discern what the highest court of that state would decide." Rounds v. Rush Trucking Corp., 211 F.3d 185, 188 (2d Cir. 2000) (alteration in original) (internal quotation marks omitted). Where there is no controlling decision from the state's highest court, federal courts "may look to any sources on which that state court might rely, including lower state court decisions." L-Tec-Elecs. Corp. v. Cougar Elec. Org., Inc., 198 F.3d 85, 87 (2d Cir. 1999). The Court finds that, based on the balance and reasoning of appellate division case law, as bolstered

by dicta from the New York Court of Appeals, if the Court of Appeals were to squarely face the issue, it would adopt the law of the First, Second, and Third Departments.

First, the overwhelming weight of authority from the First, Second, and Third Departments favors a requirement of objective medical evidence separate and apart from a plaintiff's self-serving testimony. See Cusimano, 937 N.Y.S.2d at 418; Roche v. Claverack Co-op. Ins. Co., 874 N.Y.S.2d 592, 597 (3d Dep't 2009) ("Due to plaintiff's failure to present medical evidence of severe emotional distress, defendants were entitled to dismissal of plaintiff's speculative cause of action for [IIED]."); Dankner, 850 N.Y.S.2d at 619; Milan, 791 N.Y.S.2d at 420; Walentas v. Johnes, 683 N.Y.S.2d 56, 58 (1st Dep't 1999) ("The plaintiff is required to establish that severe emotional distress was suffered . . . , which must be supported by medical evidence, not the mere recitation of speculative claims."); Augat v. State of New York, 666 N.Y.S.2d 249, 251 (3d Dep't 1997) (dismissing IIED claim because "claimants have failed to set forth any medical evidence of mental anguish").

The two recent Fourth Department cases stating the opposite rule—Cavallaro v. Pozzi and Zane v. Corbett—are not persuasive when considered in light of contradictory authority. Cavallaro deals with the issue in a single conclusory sentence and relies on supeseded case law from other departments. 814 N.Y.S.2d 462, 466 (4th Dep't 2006) ("[P]laintiff was not required to submit medical evidence" beyond alleging that he sought "medical and professional advice and treatment.").[20] Zane v. Corbett relies on Cavallaro for the proposition that medical evidence is not required to survive summary judgment on an IIED claim. 919 N.Y.S.2d 625, 629 (4th

---

[20] To support its conclusion, the Cavallaro court cited to Garcia v. Lawrence Hospital, from the First Department, and Murphy v. Murphy, from the Third Department. Cases in the First Department since Garcia have required medical substantiation. Compare Garcia v. Lawrence Hosp., 773 N.Y.S.2d 59, 60 (1st Dep't 2004) with Milan, 791 N.Y.S.2d at 420 (more recent First Department case—from 2005—requiring medical evidence in IIED case). Likewise, cases in the Third Department after Murphy have required medical evidence in IIED cases. Compare Murphy v. Murphy, 486 N.Y.S.2d 457, 459 (3d Dep't 1985) with Cusimano, 937 N.Y.S.2d at 418 (requiring medical evidence in more recent Third Department case) and Roche, 874 N.Y.S.2d at 597 (same).

Dep't 2011). Notably, two judges on the five-judge panel dissented in part, concluding that the majority's approach to the medical evidence rule was too permissive. Id. at 630-31 (Scudder, P.J., dissenting in part).

The weight of Appellate Division case law from the First, Second, and Third Departments finds some support in recent Court of Appeals dicta. In a unanimous 2008 opinion, the high court noted—with respect to a claim of negligent infliction of emotional distress ("NIED")—that "where supporting medical evidence is lacking a trial court might well preclude a plaintiff from pursuing recovery for that component of psychic distress." Ornstein v. N.Y.C. Health & Hosps. Corp., 10 N.Y.3d 1, 10 (2008).[21] Although merely dicta, this language in Ornstein suggests that, in the context of a tort similar to IIED, the Court of Appeals is inclined to require medical evidence of emotional distress.

Plaintiff in the instant case cites a more remote Court of Appeals NIED case, Johnson v. State, for the proposition that "emotional distress claims should not be prohibited simply due to a lack of medical evidence . . . ." (Pl. Mem. at 32 n.6.) But unlike Ornstein, that case speaks only to "special circumstances" that constitute exceptions to the general rule that NIED claims require objective indicia of reliability, namely, circumstances resembling the negligent transmission of a message announcing the death of a close relative or the negligent mishandling of a relative's corpse. Johnson v. State, 37 N.Y.2d 378, 381-82 (1975).[22] That case's applicability to the instant case is minimal, a conclusion also reached by another court within this circuit. See Allam v. Meyers, 906 F. Supp. 2d 274, 283 (S.D.N.Y. 2012) ("[W]e find that Johnson and the cases

---

[21] In Ornstein, the plaintiff had submitted "objective medical evidence" of her emotional distress. Ornstein, 852 N.Y.3d at 5.

[22] In these cases—given the particularly heinous nature of the conduct—courts presume "an especial likelihood of genuine and serious mental distress . . . , which serves as a guarantee that the claim is not spurious." Johnson, 37 N.Y.2d at 382. Massaro v. Charles J. O'Shea Funeral Home, which plaintiff also cites, falls into the second "special circumstance" noted in Johnson—mishandling of a relative's corpse. 738 N.Y.S.2d 384, 386 (2d Dep't 2002). It is therefore also inapplicable to the instant inquiry.

relying on it are not particularly instructive or convincing on this precise question" of medical substantiation in IIED cases.).

The Court finds that—given the balance of appellate division case law in support of a medical evidence requirement, the relatively unpersuasive rationale underlying the cases to the contrary, and the dicta in <u>Ornstein</u>—the New York Court of Appeals would likely hold that IIED claims require medical evidence to withstand a summary judgment motion. Plaintiff in the instant case does not appear to argue that he has submitted medical evidence, only that New York law does not require it. The Court's legal conclusion alone, therefore, is sufficient to merit a grant of summary judgment for defendants on the IIED claim.

However, even if plaintiff had argued that he supplied sufficient medical evidence, his IIED claim would fail. The only medical evidence he presents is his own testimony that: (1) for one month during the criminal proceedings, he took the antidepressant Zoloft for stress, as prescribed on a single visit to his regular doctor and (2) that he began to suffer from insomnia after his arrest. (Samtani Dep. 110-13; Pl. Resp. to Def. R. 56.1 ¶ 20.) He did not recall whether he was ever diagnosed with depression or anxiety, and he was never treated by "a mental health professional such as a psychiatrist, a psychologist or a social worker." (Samtani Dep. 110, 114; Pl. Resp. to Def. R. 56.1 ¶¶ 21-22.) In response to one of defendants' discovery demands, plaintiff stated that he "has not sought medical treatment in relation to this matter." (Burke Decl., Exh. M-2 at 48.)

That testimony is insufficient to establish the emotional distress prong of an IIED claim. See <u>Crews v. County of Nassau</u>, No. 06-cv-2610, 2014 WL 558696, at *19 (E.D.N.Y. Feb. 11, 2014) ("In the instant case, plaintiff relies exclusively on his own testimony to support the fourth element of his IIED claim . . . . Such evidence does not suffice to survive a motion for summary

judgment.") Without objective medical evidence, Plaintiff supplies a "mere recitation of speculative claims" insufficient to demonstrate severe emotional distress. See Walentas, 683 N.Y.S.2d at 58. The Court's conclusion is consistent with that of another court in this circuit when confronted with similar facts. Gordon v. Softech Int'l, Inc., 828 F. Supp. 2d 665, 678 (S.D.N.Y. 2011) (finding plaintiff's testimony that he "visited a physician" who "prescribed Xanax, Temezapam, and Sonata" insufficient to survive summary judgment, absent "medical reports, doctors' affidavit(s), or any other medical evidence to support his claim"), aff'd in part, vacated in part on other grounds, 726 F.3d 42 (2d Cir. 2013).

Accordingly, the absence of medical evidence of emotional distress provides an independent basis upon which the Court can grant summary judgment.

\* \* \*

Accordingly, defendants' motion for summary judgment on the IIED claim is granted.

## CONCLUSION

For the above reasons, Cherukuri's motion for summary judgment is granted with respect to Samtani's IIED claim, but denied with respect to the malicious prosecution claim.

SO ORDERED.

Dated: Brooklyn, New York
     December 3| , 2014

                                    Carol Bagley Amon
                                    Chief United States District Judge